## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 30 BENEFITS FUND, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>   v.<br><br>IMPAX LABORATORIES, INC., SANDOZ, INC., FOUGERA PHARMACEUTICALS, INC., HI-TECH PHARMACAL CO., INC., and AKORN, INC., ACTAVIS HOLDCO U.S., INC.,<br><br>Defendants. | Case No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## <u>INTRODUCTION</u>

1.     Plaintiff International Union of Operating Engineers Local 30 Benefits Fund ("IUOE 30" or "Plaintiff") brings this action both individually and on behalf of (a) a national injunctive class of person or entities in the United States and its territories who purchased, paid, and/or provided reimbursement for some or all of the purchase price of generic Lidocaine/Prilocaine topical cream manufactured by Defendants during the period from April 1, 2014 to the present and (b) a damage class of persons or entities that purchased, paid, and/or provided reimbursement for some or all of the purchase price of Lidocaine/Prilocaine manufactured by Defendants during the period April 1, 2014 to the present in the 31 states identified herein and the District of Columbia. Defendants are accused of engaging in a conspiracy to fix, maintain, and/or stabilize the prices of this generic drug. All allegations herein are based on information and belief, except for those relating to the Plaintiff.

2.     The claims in this case arise from a broad conspiracy among manufacturers of generic drugs to fix the prices charged for those drugs in recent years. The conspiracy appears to

have been effectuated by direct company-to-company contacts among generic drug manufacturers, as well as joint activities undertaken through trade associations such as the Generic Pharmaceutical Association ("GPhA"). In 2014, the Antitrust Division of the United States Department of Justice ("DOJ") commenced a wide-ranging criminal investigation of this broad conspiracy and has caused grand jury subpoenas to be issued to various Defendants in connection with this investigation. According to a June 26, 2015 report by the service Policy and Regulatory Report ("PaRR Report") (available at http://www.mergermarket.com/pdf/DoJ-Collusion-Generic-Drug-Prices-2015.pdf):

> A PaRR source says prosecutors see the case much like its antitrust probe of the auto parts industry, which has gone on for years and morphed into the department's largest criminal antitrust probe ever. Like in that case, prosecutors expect "to move from one drug to another in a similar cascading fashion."

3. Most recently, on November 3, 2016, Bloomberg reported:

> The antitrust investigation by the Justice Department, begun about two years ago, now spans more than a dozen companies and about two dozen drugs, according to people familiar with the matter. The grand jury probe is examining whether some executives agreed with one another to raise prices, and the first charges could emerge by the end of the year, they said.

> \*\*\*\*\*

> Charges could extend to high-level executives, according to the people. The antitrust division, which has an immunity program to motivate wrongdoers to confess and inform on others, has stepped up its commitment to holding individuals responsible.[1]

The Bloomberg article also likened the generic drugs conspiracy to the automotive parts cartel.

---

[1] http://www.bloomberg.com/news/articles/2016-11-03/u-s-charges-in-generic-drug-probe-said-to-be-filed-by-year-end.

4.    The claims in this case arise from a broad conspiracy among manufacturers of generic drugs to fix the prices charged for those drugs in recent years. The conspiracy appears to have been effectuated by direct company-to-company contacts among generic drug manufacturers, as well.

5.    On November 7, 2016, the publication *Mlex* reported that the DOJ had received in the summer of 2016 assistance from a leniency applicant:

> While the Justice department didn't have a whistleblower at the beginning of the investigation, it is understood that this summer a company applied for leniency, which grants full immunity to the first company to come forward and admit to cartel violations.
>
> The company is understood to be privately held and hasn't publicly disclosed its involvement in the investigation.

6.    The prediction about initial criminal prosecutions occurring before the close of 2016 proved to be correct. On December 12, 2016, the DOJ filed separate criminal Informations against Jeffrey Glazer ("Glazer") and Jason Malek ("Malek"), the respective former Chief Executive Officer ("CEO") and President of Heritage Pharmaceutical, Inc. ("Heritage"). *See* "Information," p. 2 (December 12, 2016) (ECF No. 1) in *United States v. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa.); "Information," p. 2 (December 12, 2016) (ECF No. 1) in *United States v. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa.).

7.    A press release issued by DOJ in conjunction with these filings stated:

> "Millions of Americans rely on prescription medications to treat acute and chronic health conditions. By entering into unlawful agreements to fix prices and allocate customers, these two executives sought to enrich themselves at the expense of sick and vulnerable individuals who rely upon access to generic pharmaceuticals as a more affordable alternative to brand-name medicines," said Deputy Assistant Attorney General Brent Snyder of the Justice Department's Antitrust Division. "These charges are an important step in correcting that injustice and in ensuring that generic pharmaceutical companies compete vigorously to provide these essential products at a price set by the market, not by collusion."

"Conspiring to fix prices on widely-used generic medications skews the market, flouts common decency – and very clearly breaks the law," said Special Agent in Charge Michael Harpster of the FBI's Philadelphia Division. "It's a sad state of affairs when these pharmaceutical executives are determined to further pad their profits on the backs of people whose health depends on the company's drugs. The FBI stands ready to investigate and hold accountable those who willfully violate federal antitrust law."

Today's charges are the result of an ongoing federal antitrust investigation into price fixing, bid rigging and other anticompetitive conduct in the generic pharmaceutical industry, which is being conducted by the Antitrust Division's Washington Criminal I Section with the assistance of the FBI's Philadelphia Division, the FBI headquarters' International Corruption Unit, the United States Postal Service Office of Inspector General and the U.S. Attorney's Office for the Eastern District of Pennsylvania.[2]

8.    On December 14, 2016, the attorneys general ("AGs") of 20 states[3] filed a complaint against multiple corporate manufacturers and distributors of generic medications. *State of Connecticut v. Aurobindo Pharma USA, Inc*., No. 3:16-cv-2056 VLB (D. Conn.) ("AG Complaint"). In a press release, Connecticut AG George Jepsen ("Jepsen") had this to say about the 20-state complaint:

"My office has dedicated significant resources to this investigation for more than two years and has developed compelling evidence of collusion and anticompetitive conduct across many companies that manufacture and market generic drugs in the United States," said Attorney General Jepsen. "While the principal architect of the conspiracies addressed in this lawsuit was Heritage Pharmaceuticals, we have evidence of widespread participation in illegal conspiracies across the generic drug industry. Ultimately, it was consumers – and, indeed, our healthcare system as a whole – who paid for these actions through artificially high prices for generic drugs. We intend to pursue this

---

[2] https://www.justice.gov/opa/pr/former-top-generic-pharmaceutical-executives-charged-price-fixing-bid-rigging-and-customer.

[3] The states are: Connecticut, Delaware, Florida, Hawaii, Idaho, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Minnesota, Nevada, New York, North Dakota, Ohio, Pennsylvania, Virginia, and Washington.

and other enforcement actions aggressively, and look forward to working with our colleagues across the country to restore competition and integrity to this important market."

In 2015, generic drug sales in the United States were estimated at $74.5 billion; currently, the generic pharmaceutical industry accounts for approximately 88 percent of all prescriptions written in the United States.

In July 2014, the state of Connecticut initiated an investigation of the reasons behind suspicious price increases of certain generic pharmaceuticals. The investigation, which is still ongoing as to a number of additional generic drugs, uncovered evidence of a well-coordinated and long-running conspiracy to fix prices and allocate markets for doxycycline hyclate delayed release and glyburide. In today's lawsuit, the states allege that the misconduct was conceived and carried out by senior drug company executives and their subordinate marketing and sales executives.

The complaint further alleges that the defendants routinely coordinated their schemes through direct interaction with their competitors at industry trade shows, customer conferences and other events, as well as through direct email, phone and text message communications. The anticompetitive conduct – including efforts to fix and maintain prices, allocate markets and otherwise thwart competition – caused significant, harmful and continuing effects in the country's healthcare system, the states allege.

The states further allege that the drug companies knew that their conduct was illegal and made efforts to avoid communicating with each other in writing or, in some instances, to delete written communications after becoming aware of the investigation. The states allege that the companies' conduct violated the federal Sherman Act and are asking the court to enjoin the companies from engaging in illegal, anticompetitive behavior and for equitable relief, including substantial financial relief, to address the violations of law and restore competition.[4]

9. In an interview, Jepsen further stated that "[…] this is just the tip of the iceberg […] our investigation is continuing, and it goes way beyond the two drugs in this lawsuit, and it involves many more companies than are in this lawsuit."[5] It is anticipated that numerous other companies will be accused of fixing the prices of generic drugs. Paragraph 9 of the AG

---

[4] http://www.ct.gov/ag/cwp/view.asp?Q=588538&A=2341.

[5] http://www.nytimes.com/2016/12/15/business/generic-drug-price-lawsuit-teva-mylan.html.

Complaint refers to a "wide-ranging series of conspiracies implicating numerous different drugs and competitors."

10.  The entire purpose of permitting a generic drug industry in the United States was to encourage the manufacture of less expensive, non-branded substitutes for branded prescription drugs that either had no patent exclusivity or for which the patent exclusivity was expiring. According to a 2015 GPhA report (as Jepsen noted), 88% of all prescriptions in United States are filled with a generic drug.[6] Data from IMS Health depict the growing trend of filling prescriptions with generic drugs:



**Percent share of prescriptions**

Source: IMS Health, National Prescription Audit, Jan 2014

In a January 2012 report, the GAO noted that "[o]n average, the retail price of a generic drug is 75 percent lower than the retail price of a brand-name drug."[7]

11.    The price increases described herein endanger human lives and well-being. Lidocaine/Prilocaine blends are used as anesthetic agents.

12.    Plaintiff alleges that during the Class Period, Defendants conspired, combined and contracted to fix, raise, maintain and stabilize prices at which Lidocaine/Prilocaine cream would be sold. As a result of Defendants' unlawful conduct, Plaintiff and the members of the proposed

---

[6] http://www.gphaonline.org/media/wysiwyg/PDF/GPhA_Savings_Report_2015.pdf.

[7] http://www.gao.gov/assets/590/588064.pdf.

Classes paid artificially inflated prices that exceeded the amount they would have paid if a competitive market had determined prices for the Generic Drugs.

## JURISDICTION AND VENUE

13.    Plaintiff brings this action under Section 16 of the Clayton Act (15 U.S.C. § 26), for injunctive relief and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiff and the members of the Class by reason of the violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

14.    This action is also instituted under the antitrust, consumer protection, and common laws of various states for damages and equitable relief, as described in Counts Two through Four below.

15.    Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1337 and by Section 16 of the Clayton Act (15 U.S.C. § 26). In addition, jurisdiction is also conferred upon this Court by 28 U.S.C. § 1367.

16.    Venue is proper in this judicial district pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C § 1391(b), (c) and (d) because during the Class Period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District. Venue is also proper in this District because the federal grand jury investigating the pricing of generic drugs is empaneled here and therefore it is likely that acts in furtherance of the alleged conspiracy took place here.

17.    This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) sold Lidocaine/Prilocaine cream throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) was engaged in

7

an illegal scheme and price-fixing conspiracy that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

## PLAINTIFF

18.    Plaintiff IUOE 30 is a local union that has served the interests of operating engineers and facilities maintenance workers for over a century. It is headquartered in Whitestone, New York. IUOE 30 provides health care, retirement and other benefits to both private sector and municipal employees through a series of not-for-profit trust funds. Retired private sector and municipal employees, who reside in numerous locations in the United States, can obtain benefits under either IUOE 30 Private Industry Retiree Benefit Plans or the IUOE 30 Municipal Retired Employees Welfare Trust Fund. For prescriptions of generic drugs, such as the Generic Drugs manufactured by one or more Defendants, the employee plan participant typically pays 30% of the cost of the prescription, with a $10 minimum co-payment. Participating pharmacies collect the co-payment from the employee plan participant and bill IUOE 30 for the remaining cost of the Lidocaine/Prilocaine cream purchases. As a result of the alleged conspiracy, Plaintiff was injured in its business or property by reason of the violations of law alleged herein.

## DEFENDANTS

19.    Defendant Impax Laboratories, Inc. is a Delaware corporation that has its principal place of business in Hayward, California. Impax Laboratories' generics division called Global Pharmaceuticals (collectively referred to as "Impax") is a manufacturer and/or distributor of Lidocaine/Prilocaine cream. During the Class Period, Impax marketed and sold Lidocaine/Prilocaine cream to customers in this District and in other locations in the United States.

8

20.     Defendant Sandoz, Inc. ("Sandoz") is a Colorado corporation with its principal place of business in Princeton, New Jersey. During the Class Period, Sandoz marketed and sold generic Lidocaine/Prilocaine to customers in this District and in other locations in the United States. Sandoz is a generic division of pharmaceutical giant Novartis AG.

21.     Defendant Fougera Pharmaceuticals Inc. ("Fougera") is a New York corporation with its principal place of business in Melville, New York. Fougera is a wholly owned subsidiary of Sandoz, which acquired it in July 2012 for $1.5 billion. During the Class Period, Fougera marketed and sold generic Lidocaine/Prilocaine products to customers in this District and in other locations in the United States. Collectively, Sandoz and Fougera shall be referred to herein as Sandoz.

22.     Defendant Hi-Tech Pharmacal Co., Inc. ("Hi-Tech") is a Delaware corporation with its principal place of business in Amityville, New York. On April 17, 2014, Akorn, Inc. ("Akorn") announced that it acquired Hi-Tech for $640 million. During the Class Period, Hi-Tech manufactured and distributed generic Lidocaine/Prilocaine to customers in this District and in other locations in the United States.

23.     Defendant Akorn is a Louisiana corporation with its principal place of business in Lake Forest, Illinois. During the Class Period, Akorn manufactured and sold generic Lidocaine/Prilocaine to customers in this District and in other locations in the United States. Collectively, Akorn and Hi-Tech shall be referred to herein as ("Akorn").

24.     Defendant Actavis Holdco U.S., Inc. ("Actavis") is a Delaware corporation that has its administrative headquarters in Parsippany-Troy Hills, New Jersey. In 2012, Watson Pharmaceuticals, Inc. acquired then-Switzerland-based Actavis Group to form Actavis plc, later known as Allergan plc after Actavis plc acquired Allergan Inc. in 2015. In August 2016, Teva

Pharmaceutical Industries Ltd. ("Teva") acquired Allergan plc's generic pharmaceutical business for $40.5 billion. Actavis Holdco U.S., Inc. was among Allergan plc's generic pharmaceutical entities acquired by Teva. During the Class Period, Actavis sold the branded version of Lidocaine/Prilocaine, known as EMLA, to customers in this District and in other locations in the United States, including through its subsidiary, Warner Chilcott (US), LLC. For purposes of this complaint, EMLA is considered a generic version of Lidocaine/Prilocaine.

25.    Whenever in this Complaint reference is made to any act, deed or transaction of any corporation, the allegation means that the corporation engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

26.    All acts alleged in this Complaint to have been done by Defendants were performed by their officers, directors, agents, employees or representatives while engaged in the management, direction, control or transaction of Defendants' business affairs.

## CO-CONSPIRATORS

27.    Various other persons, firms, corporations and entities have participated as unnamed co-conspirators with Defendants in the violations and conspiracy alleged herein. In order to engage in the offenses charged and violations alleged herein, these co-conspirators have performed acts and made statements in furtherance of the antitrust violations and conspiracies alleged herein.

28.    At all relevant times, each Defendant was an agent of each of the remaining Defendants, and in doing the acts alleged herein, was acting within the course and scope of such agency. Each Defendant ratified and/or authorized the wrongful acts of each of the Defendants.

Defendants, and each of them, are individually sued as participants and as aiders and abettors in the improper acts and transactions that are the subject of this action.

## INTERSTATE TRADE AND COMMERCE

29.     The business activities of Defendants that are the subject of this action were within the flow of, and substantially affected, interstate trade and commerce.

30.     During the Class Period, Defendants sold substantial quantities of the Generic Drugs in a continuous and uninterrupted flow of interstate commerce to customers throughout the United States.

## FACTUAL ALLEGATIONS

### The Industry

31.     Defendants manufacture and sell, *inter alia*, generic versions of a branded drug once the patent on the branded drug expires.

32.     According to the FDA's Glossary, a generic drug is "the same as a brand name drug in dosage, safety, strength, how it is taken, quality, performance, and intended use."[8] Once the FDA approves a generic drug as "therapeutically equivalent" to a brand drug, the generic version "can be expected to have equal effect and no difference when substituted for the brand name product." *Id.*

33.     Due to the price differentials between branded and generic drugs, as well as other institutional features of the pharmaceutical industry, pharmacists liberally and substantially substitute the generic drug when presented with a prescription for the branded drug. Since passage of the Hatch-Waxman Act (Pub. L. No. 98-417, 98 Stat. 1585 (codified at 15 U.S.C. §§ 68b-68c, 70b; 21 U.S.C. §§ 301 note, 355, 360cc; 28 U.S.C. § 2201; 35 U.S.C. §§ 156, 271, 282)), every state has adopted substitution laws requiring or permitting pharmacies to substitute generic

---

[8] http://www.fda.gov/Drugs/InformationOnDrugs/ucm079436.htm#G.

drug equivalents for branded drug prescriptions (unless the prescribing physician specifically orders otherwise by writing "dispense as written" or similar language on the prescription).

## Markets for Generic Lidocaine/Prilocaine

34.     The markets for generic forms of Lidocaine/Prilocaine are mature and the Defendants in those markets can only gain market share by competing on price.

35.     Lidocaine/Prilocaine is a combination anesthetic indicated for dermal anesthesia. It has been marketed in the United States under the brand name EMLA.

36.     Defendants are manufacturers and/or distributors of generic versions of Lidocaine/Prilocaine. These Defendants collectively sell hundreds of millions of dollars worth of this drug every year in the United States.

37.     A drug company seeking approval to market a generic equivalent of a brand name drug must refer to the Reference Listed Drug ("RLD") in its Abbreviated New Drug Application ("ANDA"). Once the FDA determines that a drug company's application contains sufficient scientific evidence establishing the bioequivalence of the product to the RLD, an applicant may manufacture and market the generic drug product to provide a safe, effective, low cost alternative to the American public.

38.     Furthermore, the FDA will generally assign a Therapeutic Equivalence Code ("TE Code") of AB to those products it finds to be bioequivalent.[9] This coding system allows users to quickly determine important information about the drug product in question.[10] For example, the Food & Drug Administration ("FDA") states that "[p]roducts generally will be coded AB if a study is submitted demonstrating bioequivalence. Even though drug products of

---

[9] http://www.fda.gov/Drugs/DevelopmentApprovalProcess/FormsSubmissionRequirements/ElectronicSubmissions/DataStandardsManualmonographs/ucm071713.htm.

[10] http://www.fda.gov/Drugs/DevelopmentApprovalProcess/ucm079068.htm#TEC.

distributors and/or repackagers are not included in the list, they are considered therapeutically equivalent to the application holder's drug product if the application holder's drug product is rated AB."[11]

39.    Each of the generic drugs is bioequivalent to an RLD.

40.    The markets for generic versions of Lidocaine/Prilocaine cream are controlled by the Defendants. In fact, the Federal Trade Commission ("FTC") has specifically asserted in recent years that the market for Lidocaine/Prilocaine is highly concentrated and subject to anticompetitive conduct. The HHI—or Herfindahl-Hirschman Index—is "a commonly accepted measure of market concentration." The FTC and the Department of Justice "generally consider markets in which the HHI is between 1,500 and 2,500 points to be moderately concentrated, and consider markets in which the HHI is in excess of 2,500 points to be highly concentrated."[12]

41.    The FTC filed a complaint against Defendant Sandoz's parent, Novartis AG, seeking to enjoin Novartis AG's acquisition of Defendant Fougera in July 2012. The FTC specifically alleged that the acquisition would create antitrust concerns in the market for "generic Lidocaine-Prilocaine cream." According to the FTC, "Lidocaine-Prilocaine is available in . . . 30 gram tubes …. [t]he 30 gram tubes are prescribed directly to patients for home use. Fougera, Hi-Tech Pharmaceutical Co. ('Hi-Tech'), and Novartis are the only U.S. suppliers of 30 gram tubes, with market shares of approximately 50 percent, 47 percent, and 3 percent, respectively. The Acquisition would increase the Herfindahl-Hirschman Index concentration in that market by 300 points to 5,018 points, and leave Hi-Tech as the only competitor to the combined

---

[11]http://www.fda.gov/Drugs/DevelopmentApprovalProcess/FormsSubmissionRequirements/ElectronicSubmissions/DataStandardsManualmonographs/ucm071713.htm.

[12] https://www.justice.gov/atr/herfindahl-hirschman-index.

Novartis/Fougera."[13] The FTC settled with Novartis AG by, in part, requiring Novartis to terminate its marketing agreement with Tolmar on Lidocaine/Prilocaine.[14]

42.    Defendant Impax and Defendant Akorn entered the Lidocaine/Prilocaine market in 2013.

43.    In 2014, the FTC sought to enjoin Akorn's acquisition of Hi-Tech and filed an administrative complaint alleging that the acquisition was anticompetitive. In that complaint, the FTC specifically alleged that the acquisition would cause the number of competitors of "generic topical cream containing 2.5% Lidocaine with Prilocaine," which the FTC defined as generic EMLA cream, to drop from 4 to 3, "would increase the HHI by 1488, from 4481 to a post-merger total of 5969, and would create a merged entity having a market share in excess of 74%."[15] The FTC alleged that Akorn had a market share of 12% and that Hi-Tech had a market share of 62%. After filing its administrative complaint, the FTC settled the matter by requiring the divestiture of portions of the Akorn/Hi-Tech Lidocaine/Prilocaine business to Watson Pharmaceuticals, Inc., which is now known as Defendant Actavis.[16] In conjunction with the divestiture, on April 17, 2014, Akorn and Actavis entered into a supply agreement under which Akorn would supply Lidocaine/Prilocaine cream to Defendant Actavis for a transitional period of either two years or until an alternative supplier is found.[17]

---

[13] https://www.ftc.gov/sites/default/files/documents/cases/2012/07/120716novartiscmpt.pdf.

[14] https://www.ftc.gov/news-events/press-releases/2012/07/ftc-puts-conditions-novartis-ags-acquisition-fougera-holdings-inc.

[15] https://www.ftc.gov/system/files/documents/cases/140414akorntechcmpt.pdf.

[16] https://www.ftc.gov/system/files/documents/cases/140620akorndo.pdf.

[17] https://www.sec.gov/Archives/edgar/data/1578845/000119312515052898/d842874d10k.htm.

44.    Akorn's settlement resolved the FTC action in April 2014—after convincing the FTC that the Lidocaine/Prilocaine market would be sufficiently competitive following the merger and divestiture of part of its Lidocaine/Prilocaine business to Defendant Actavis. Despite its assurances to the FTC, Defendants Actavis, Akorn, Sandoz, and Impax immediately began increasing the price of Lidocaine/Prilocaine cream.

## Defendants' Pricing Activities

45.    Defendants' unexplained price hikes have engendered extensive scrutiny by the United States Congress and by federal and state antitrust regulators. In a January 8, 2014 letter to members of key committees of the United States House of Representatives and Senate, Douglas P. Hoey, Chief Executive Officer of the National Community Pharmacists' Association ("NCPUA"), asked Congress to conduct an investigation of generic drug price increases.[18] On October 2, 2014, Sanders and Cummings sent letters to several of the Defendants about specific price spikes, including Actavis, Impax's generics division, Global, and Lannett Company, Inc.[19]

46.    The following chart tracks Lidocaine/Prilocaine cream (30 gram tube) pricing:

---

[18]https://www.ncpanet.org/pdf/leg/jan14/letter-generic-spikes.pdf.

[19] The October Letters may be found at http://www.sanders.senate.gov/newsroom/press-releases/congress-investigating-why-generic-drug-prices-are-skyrocketing.



47.     Immediately prior to the historically unprecedented price increase referenced in the preceding paragraph, Defendants Actavis, Akorn, Impax, Hi-Tech and Sandoz attended the GPhA annual meeting held on February 19-21, 2014 in Orlando, Florida.

48.     On November 20, 2014, Sanders's committee held a hearing entitled "Why Are Some Generic Drugs Skyrocketing In Price?" ("Senate Hearing"). Various witnesses discussed the price hikes for generic drugs.

49.     Industry analysts have questioned manufacturers' claims that price increases are due to supply disruptions. Indeed, Richard Evans at Sector & Sovereign Research recently wrote: "[a] plausible explanation [for price increases of generic drugs] is that generic manufacturers, having fallen to near historic low levels of financial performance are cooperating to raise the

prices of products whose characteristics – low sales due to either very low prices or very low volumes – accommodate price inflation."[20]

### Generic Manufacturers' Statements About Generic Drug Competition

50.    Defendants' sudden and massive price increases represented a sharp departure from the previous years of low and stable prices. This in itself is indicative of collusion. In addition, statements made by Arthur P Bedrosian, President and CEO of generic manufacturer Lannett Company, Inc. ("Lannett")[21], in documents and in oral remarks at quarterly earnings calls with market analysts and the investigations of state and federal antitrust regulators, reinforce this inference of collusion.[22]

51.    In a fourth quarter 2013 earnings call that occurred on September 10, 2013, Bedrosian signaled Lannett's intention to increase prices and his expectations that his competitors would follow suit, one of which was Defendant Impax in the generic market for Digoxin. Discussing the role of his Vice President of Sales, one of the persons apparently subpoenaed by the DOJ, Bedrosian said:

> We're not a price follower. We tend to be a price leader on price increasing and the credit goes to my sales vice president. He takes an aggressive stance towards raising prices. He understands one of his goals, his objectives as a sales vice president is to increase profit margins for the company. And he's the first step in that process….***I am finding a climate out there has been changed dramatically and I see more price increases coming from our competing—competitors than I've seen in the past. And we're going to continue to lead. We have more price increases planned for this year within our budget. And hopefully, our competitors follow suit.*** (Emphases added).

---

[20] http://blogs.wsj.com/pharmalot/2015/04/22/generic-drug-prices-keep-rising-but-is-a-slowdown-coming/.

[21] Lannett is a distributor of Terbutaline Sulfate tablets as well as generic digoxin and generic doxycycline.

[22] http://seekingalpha.com/symbol/LCI?source=search_general&s=lci.

52.    In a quarterly earnings call held on November 3, 2014, Bedrosian again expressed confidence that Lannett would not have to engage in price competition generally in the generic drug market. He said Lannett and its competitors were "*less concerned about grabbing market share. We're all interested in making a profit, not how many units we sell*." (Emphases added). He predicted that price increases would continue.

53.    On February 4, 2015, in another quarterly earnings call, Bedrosian confirmed there would be a moratorium on price competition. He stated: "*I think you're going to find more capital pricing [in the generic marketplace], more—I'll say less competition, in a sense. You won't have price wars*." (Emphases added). In his view, "*I just don't see the prices eroding like they did in the past*." (Emphases added).

54.    Frederick Wilson, the CEO of Impax, also spoke to this topic in a third quarter 2014 earnings call: "we've done what most of the other generic competitors have done, we look at opportunities, we look at how competition shifts, we look at where there may be some market movement that will allow us to take advantages on price increases and we've implemented those…."[23]

55.    The price increases seen in these generic drug markets are historical abnormalities that cannot be explained by the normal laws of supply and demand. The FDA has studied generic drug pricing over the years and has noted, based on long-term research, that "[g]eneric competition is associated with lower drug prices."[24]

---

[23] http://www.nasdaq.com/symbol/ipxl/call-transcripts.

[24] http://www.fda.gov/AboutFDA/CentersOffices/OfficeofMedicalProductsandTobacco/CDER/ucm129385.htm.

56.     The FDA requires manufacturers to report any supply shortages. The FDA then posts these shortages on its website. On information and belief, none were reported for Lidocaine/Prilocaine cream during the class period.

57.     Similarly, the American Society of Health-System Pharmacists collects and reports drug supply shortages. Lidocaine/Prilocaine cream does not appear on either its current or resolved shortages lists.

58.     Defendants' price increases assured them handsome profits. According to its 2015 SEC Form 10-K filed on February 26, 2015, Impax experienced $596 million in total revenues in the 2014 calendar year, compared to $511 million in 2013—a 17% increase.[25]

## Congressional And Regulators' Responses

59.     Sanders and Cummings followed up on the Senate Hearing by writing a letter on February 24, 2015 to the Office of the Inspector General ("OIG") of the Department of Health & Human Services, asking it to investigate the effect price increases of generic drugs have had on generic drug spending within the Medicare and Medicaid programs.[26] The OIG responded in a letter dated April 13, 2015, saying it planned to engage in a review of quarterly average manufacturer prices for the 200 top generic drugs from 2005 through 2014.[27]

60.     Antitrust regulators have also been actively investigating the price hikes. By November 3, 2014, as noted above, the DOJ opened a criminal grand jury investigation into the pricing of various generic drugs. The DOJ is poised to issue criminal indictments against various

---

[25] http://d1lge852tjjqow.cloudfront.net/CIK-0001003642/c545ab21-aa3d-4426-a0b9-ba4373b6c213.pdf?noexit=true.

[26] http://www.sanders.senate.gov/download/sanders-cummings-letter?inline=file.

[27] http://www.sanders.senate.gov/download/oig-letter-to-sen-sanders-4-13-2015?inline=file.

companies, as early as December of this year. State Attorneys' General, led by the Connecticut

Attorney General have also pursued their own investigations.

61.    As noted above, Defendant Impax disclosed the following in its August 4, 2016

Form 10-Q filed with the Securities & Exchange Commission ("SEC"):

> Previously on November 6, 2014, the Company disclosed that one
> of its sales representatives received a grand jury subpoena from the
> Antitrust Division of the United States Justice Department (the
> "Justice Department"). In connection with this same investigation,
> on March 13, 2015, the Company received a grand jury subpoena
> from the Justice Department requesting the production of
> information and documents regarding the sales, marketing, and
> pricing of certain generic prescription medications. In particular,
> the Justice Department's investigation currently focuses on four
> generic medications: digoxin tablets *[and] Prilocaine/Lidocaine*
> *cream*..... [Emphasis Added].

62. Just  before  Allergan  sold  its  generics  business  unit—Actavis—to  Teva

Pharmaceutical Industries, Ltd., it disclosed the following in its 10-Q for the period ending June

30, 2016: "*Actavis*. On June 25, 2015, the Company received a subpoena from the U.S.

Department of Justice ('DOJ'), Antitrust Division seeking information relating to the marketing

and pricing of certain of the Company's generic products and communications with competitors

about such products."

63. In an SEC Form 10-Q dated February 6, 2015, Lannett said that on November 3,

2014, "the Senior Vice-President of Sales and Marketing was served with a grand jury subpoena

relating to a federal investigation of the generic pharmaceutical industry into possible violations

of the Sherman Act."[28] The responses to that subpoena led to the issuance of a second grand jury

subpoena to Lannett itself. It noted in the same SEC filing that on December 5, 2014, "[t]he

---

[28]

http://app.quotemedia.com/data/downloadFiling?webmasterId=101533&ref=10044800&type=HTML&symbol=LCI&companyName=Lannett+Co.+Inc.&formType=10-Q&dateFiled=2015-02-06.

Company was served with a grand jury subpoena related to the federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act. The subpoena requests corporate documents from the Company relating to corporate, financial, and employee information, communications or correspondence with competitors regarding the sale of generic prescription medications, and the marketing, sale, or pricing of certain products." A report in *Pharmacy Times* described the subpoenas as follows:

> The Lannett Company, Inc, subpoena covers 2 specific areas related to antitrust laws and generic drug pricing. The first portion covers a Connecticut Attorney General investigation into whether the company or its employees engaged in price fixing, maintaining, or controlling for digoxin. The second portion serves the company's senior vice president of sales and marketing with a grand jury subpoena pertaining to Sherman antitrust act violations in the generic drug industry. That subpoena requests any documents exchanged with competitors related to the sale of any generic prescription medications during any time period.[29]

Similar statements are contained in Lannett's SEC Form 10-Q, filed on February 9, 2016.[30]

64. On August 27, 2015, Lannett issued an SEC Form 10-K. It contains this further explanation of the DOJ investigation:

> In fiscal year 2015, the Company and certain affiliated individuals each were served with a grand jury subpoena relating to a federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act. The subpoenas request corporate documents of the Company relating to corporate, financial, and employee information, communications or correspondence with competitors regarding the sale of generic prescription medications, and the marketing, sale, or pricing of certain products, generally for the period of 2005 through the dates of the subpoenas.[31]

---

[29] http://www.pharmacytimes.com/publications/issue/2014/December2014/Senate-Hearing-Investigates-Generic-Drug-Prices.

[30] http://www.sec.gov/Archives/edgar/data/57725/000110465916094983/a15-24119_110q.htm.

[31] http://www.sec.gov/Archives/edgar/data/57725/000110465915062047/a15-13005_110k.htm.

65.     The fact that these companies received subpoenas from a federal grand jury is significant, as is reflected in Chapter 3 of the 2014 edition of the DOJ's *Antitrust Division Manual*.[32] Section F.1 of that chapter notes that "staff should consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution." *Id.* at III-82. The staff request needs to be approved by the relevant field chief and is then sent to the Antitrust Criminal Enforcement Division." *Id.* "The DAAG [Deputy Assistant Attorney General] for Operations, the Criminal DAAG, and the Director of Criminal Enforcement will make a recommendation to the Assistant Attorney General. If approved by the Assistant Attorney General, letters of authority are issued for all attorneys who will participate in the grand jury investigation." *Id.* at III-83. "The investigation should be conducted by a grand jury in a judicial district where venue lies for the offense, such as a district from or to which price-fixed sales were made or where conspiratorial communications occurred." *Id.* Thus, the fact that certain of the Defendants received federal grand jury subpoenas is a strong indicator that antitrust offenses have occurred.

66.     Commentators have also taken note of the criminal subpoenas being issued. As noted on one legal website:

> The Justice Department's subpoenas focus on sharing and exchanging of pricing information and other issues among generic drug companies. The initial subpoenas, including two senior executives, suggest that the Justice Department has specific information relating to their participation in potentially criminal conduct. It is rare for the Justice Department to open a criminal investigation with specific subpoenas for individuals, along with company-focused subpoenas.
>
> Given the breadth of such a potential cartel investigation, the Justice Department's inquiry of the generic pharmaceutical industry could be significant. The prices for a large number of generic drug prices have increased significantly over the last year.

---

[32] http://www.justice.gov/atr/public/divisionmanual/chapter3.pdf.

> There does not appear to be any rational explanation for such increases involving a diverse set of products.
>
> The scope of these price increases and the timing of them certainly raise serious concerns about collusive activity among competitors.[33]

67.    Or, as Mark Rosman, former assistant chief of the National Criminal Enforcement Section of DOJ's Antitrust Division, noted in an article on the "unusual" nature of the criminal subpoenas, "[a] DOJ investigation into the alleged exchange of pricing information in the pharmaceutical industry likely indicates that the agency anticipates uncovering criminal antitrust conduct in the form of price-fixing or customer allocation."[34]

68.    And, as another legal commentator has recently noted,

> The recent disclosure widens the DOJ's criminal probe into whether or not leading generic drug providers are colluding to artificially raise generic drug prices. According to data from the Centers for Medicare and Medicaid Services (CMS), more than half of all generic drug prices rose between June 2013 and June 2014, including 10 percent of all generic drugs doubling in price during that time. As the fourth largest generics producer in the world, at least prior to the Teva deal, Allergan is largest company to be involved in the DOJ investigation so far.[35]

69.    Also of significance is the fact reported in *mlex* that there is a leniency applicant who has sought amnesty from the DOJ. As explained on one of the DOJ's webpages (http://www.justice.gov/atr/frequently-asked-questions-regarding-antitrust-divisions-leniency-program):

---

[33] http://www.jdsupra.com/legalnews/criminal-global-cartel-focus-on-generic-92387/.

[34] https://www.wsgr.com/publications/PDFSearch/rosman-1114.pdf.

[35] http://www.legalreader.com/doj-subpoenas-allergan-as-generics-antitrust-probe-widens/.

**5. Does a leniency applicant have to admit to a criminal violation of the antitrust laws before receiving a conditional leniency letter?**

Yes. The Division's leniency policies were established for corporations and individuals "reporting their illegal antitrust activity," and the policies protect leniency recipients from criminal conviction. Thus, the applicant must admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes before it will receive a conditional leniency letter. Applicants that have not engaged in criminal violations of the antitrust laws have no need to receive leniency protection from a criminal violation and will receive no benefit from the leniency program.

As indicated on the webpage, the leniency applicant must also establish "[t]he confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials."

### Factors Increasing The Market's Susceptibility To Collusion

70.     Factors that make a market susceptible to collusion include: (1) a high degree of industry concentration; (2) significant barriers to entry; (3) inelastic demand; (5) a standardized product with a high degree of interchangeability between the goods of cartel participants; (5) absence of a competitive fringe of sellers; and (6) intercompetitor contacts and communication.

71.     *Industry Concentration*. A high degree of concentration facilitates the operation of a cartel because it makes it easier to coordinate behavior among co-conspirators.

72.     In the United States, Lidocaine/Prilocaine cream has an extremely high HHI, as noted above, which makes the market for this product an excellent candidate for collusion.

73.     *Barriers To Entry*. Supracompetitive pricing in a market normally attracts additional competitors who want to avail themselves of the high levels of profitability that are available. However, the presence of significant barriers to entry makes this more difficult and helps to facilitate the operation of a cartel.

74.    Here, there are significant capital, regulatory and intellectual property barriers to entry in the generic markets for Lidocaine/Prilocaine. Costs of manufacture, coupled with regulatory oversight, represent a substantial barrier to entry.

75.    Intellectual property costs are substantial.

76.    ***Demand Inelasticity***. Price elasticity of demand is defined as the measure of responsiveness in the quantity demanded for a product as a result of change in price of the same product. It is a measure of how demand for a product reacts to a change in price. The basic necessities of life—food, water, and shelter—are examples of goods that experience nearly perfectly inelastic demand at or near the minimums necessary to sustain life. In order for a cartel to profit from raising prices above competitive levels, demand for the product must be sufficiently inelastic such that any loss in sales will be more than offset by increases in revenue on those sales that are made. Otherwise, increased prices would result in declining revenues and profits.

77.    Prilocaine/Lidocaine cream is an important prescription drug. When a doctor prescribes it, a consumer has little choice but to buy it at the price offered. Thus, Lidocaine/Prilocaine cream is an excellent candidate for cartelization because price increases will result in more revenue, rather than less.

78.    ***Standardized Product with High Degree of Interchangeability***. A commodity-like product is one that is standardized across suppliers and allows for a high degree of substitutability among different suppliers in the market. When products offered by different suppliers are viewed as interchangeable by purchasers, it is easier for the suppliers to agree on prices for the good in question and it is easier to monitor these prices effectively. Here, each of the versions of Lidocaine/Prilocaine cream described above use identical active ingredients. And

the generic substitution laws referenced earlier in the Complaint prevent a manufacturer from raising prices independently.

79.     ***Absence of a Competitive Fringe of Sellers***. Companies that are not part of the conspiracy can erode conspirators' market shares by offering products at a lower, more competitive price. This reduces revenue and makes sustaining a conspiracy more difficult. In the market for generic Lidocaine/Prilocaine cream, there is no realistic threat that a fringe of competitive sellers will take market share from Defendants. The Defendants in this market have oligopolistic power, which facilitates their ability to raise prices without losing market share to non-conspirators.

80.     ***Intercompetitor Contacts and Communications***. In order to be successful, collusive agreements require a level of trust among the conspirators. Collaboration fostered through industry associations facilitate relationships between individuals who would otherwise be predisposed to compete vigorously with each other. Here, many of the Defendants remain members of or participants in the GPhA, which describes itself on its website as "the nation's leading trade association for manufacturers and distributors of generic prescription drugs, manufacturers of bulk active pharmaceutical chemicals, and suppliers of other goods and services to the generic industry."[36] These include Defendants Actavis, Impax, Hi-Tech, and Sandoz. Thus, representatives of the Defendants have opportunities to meet and conspire at functions of this group, as well as at industry healthcare meetings. The grand jury subpoenas discussed above lend further support to the conclusion that intercompetitor communications occurred with respect to the pricing of generic drugs. Indeed, according to the previously-identified PaRR Report, "prosecutors are taking a close look at trade associations as part of their

---

[36] http://www.gphaonline.org/about/the-gpha-association.

investigation as having been one potential avenue for facilitating the collusion between salespeople at different generic producers." As noted earlier, Actavis, Impax, Hi-Tech and Sandoz attended the GPhA annual meeting held on February 19-21, 2014 in Orlando, Florida just prior to the massive price spike for generic Lidocaine/Prilocaine cream.

## **DEFENDANTS' ANTITRUST VIOLATIONS**

81.     During the Class Period, the Defendants engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain or stabilize the prices of generic Lidocaine/Prilocaine cream sold in the United States.

82.     In formulating and effectuating the contract, combination or conspiracy, the Defendants identified above and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to artificially raise, fix, maintain, and/or stabilize the price of generic Lidocaine/Prilocaine cream sold in the United States. These activities included the following:

        a.     Defendants participated in meetings and/or conversations to discuss the price of generic Lidocaine/Prilocaine cream in the United States;

        b.     Defendants agreed during those meetings and conversations to charge prices at specified levels and otherwise to increase and/or maintain prices of generic Lidocaine/Prilocaine cream sold in the United States;

        c.     Defendants agreed during those meetings and conversations to fix the price of generic Lidocaine/Prilocaine cream sold in the United States; and

        d.     Defendants issued price announcements and price quotations in accordance with their agreements.

Defendants and their co-conspirators engaged in the activities described above for the purpose of

effectuating the unlawful agreements described in this Complaint.

83.     During and throughout the period of the conspiracy alleged in this Complaint, Plaintiff and members of the Class purchased generic Lidocaine/Prilocaine cream from Defendants (or their subsidiaries or controlled affiliates) or their co-conspirators at inflated and supracompetitive prices.

84.     Defendants' contract, combination or conspiracy constitutes an unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) and the laws of various states.

85.     As a result of Defendants' unlawful conduct, Plaintiff and the members of the Class have been injured in their business and property in that they have paid more for generic Lidocaine/Prilocaine cream than they would have paid in a competitive market.

86.     The unlawful contract, combination or conspiracy has had the following effects, among others:

    a.     price competition in the market for generic Lidocaine/Prilocaine cream has been artificially restrained;

    b.     prices for generic Lidocaine/Prilocaine cream sold by the Defendants have been raised, fixed, maintained, and/or stabilized at artificially high and non-competitive levels; and

    c.     purchasers of generic Lidocaine/Prilocaine cream from the Defendants have been deprived of the benefit of free and open competition in the market for generic Lidocaine/Prilocaine cream.

## CLASS ACTION ALLEGATIONS

87.    Plaintiff brings this action on behalf of itself and as a class action under Rule

23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief

on behalf of the following class (the "Nationwide Class"):

> All persons and entities in the United States and its territories who
> purchased, paid and/or provided reimbursement for some or all of
> the purchase price for Defendants' generic Lidocaine/Prilocaine
> cream from April 1, 2014 through the present. This class excludes:
> (a) Defendants, their officers, directors, management, employees,
> subsidiaries, and affiliates; (b) all federal and state governmental
> entities except for cities, towns, or municipalities with self-funded
> prescription drug plans; (c) all persons or entities who purchased
> Defendants' generic Lidocaine/Prilocaine cream for purposes of
> resale or directly from Defendants; (d) fully insured health plans
> (*i.e.*, health plans that purchased insurance covering 100% of their
> reimbursement obligation to members); (e) any "flat co-pay"
> consumers whose purchases of Defendants' generic
> Lidocaine/Prilocaine cream were paid in part by a third party payor
> and whose co-payment was the same regardless of the retail
> purchase price; and (f) any judges or justices involved in this
> action and any members of their immediate families.

88.    Plaintiff also brings this action on behalf of himself and as a class action under

Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the

common law of unjust enrichment and the state antitrust, unfair competition, and consumer

protection laws of the states listed below (the "Indirect Purchaser States")[37] on behalf of the

following class (the "Damages Class"):

> All persons and entities in the Indirect Purchaser States who
> purchased, paid and/or provided reimbursement for some or all of
> the purchase price for Defendants' generic Lidocaine/Prilocaine
> cream from April 1, 2014 through the present. This class excludes:

---

[37] The "Indirect Purchaser States" consist of Alabama, Arkansas, Arizona, California, District of Columbia, Florida, Hawaii, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Missouri, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia and Wisconsin.

(a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal and state governmental entities except for cities, towns, or municipalities with self-funded prescription drug plans; (c) all persons or entities who purchased Defendants' generic Lidocaine/Prilocaine cream for purposes of resale or directly from Defendants; (d) fully insured health plans (*i.e.*, health plans that purchased insurance covering 100% of their reimbursement obligation to members); (e) any "flat co-pay" consumers whose purchases of Defendants' generic Lidocaine/Prilocaine cream were paid in part by a third party payor and whose co-payment was the same regardless of the retail purchase price; and (f) any judges or justices involved in this action and any members of their immediate families.

89.    The Nationwide Class and the Damages Class are referred to herein as the "Classes."

90.    While Plaintiff does not know the exact number of the members of the Classes, Plaintiff believes there are millions of members in each Class.

91.    Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all the members of both Classes, thereby making appropriate relief with respect to the Classes as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

a.    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain and/or stabilize prices of generic Lidocaine/Prilocaine cream and/or engaged in market allocation for generic Lidocaine/Prilocaine cream sold by prescription in the United States;

b.    The identity of the participants of the alleged conspiracy;

c.    The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

d.    Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Count;

e.    Whether the alleged conspiracy violated state antitrust and unfair competition laws, and/or state consumer protection

laws, as alleged in the Second and Third Counts;

f.     Whether the Defendants unjustly enriched themselves to the detriment of the Plaintiff and the members of the Classes, thereby entitling Plaintiff and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Fourth Count;

g.     Whether the conduct of the Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiff and the members of the Classes;

h.     The effect of the alleged conspiracy on the prices of generic Lidocaine/Prilocaine cream sold in the United States during the Class Period;

i.     The appropriate injunctive and related equitable relief for the Nationwide Class; and

j.     The appropriate class-wide measure of damages for the Damages Class.

92.     Plaintiff's claims are typical of the claims of the members of the Classes, and Plaintiff will fairly and adequately protect the interests of the Classes. Plaintiff and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for generic Lidocaine/Prilocaine cream purchased indirectly from the Defendants and/or their co-conspirators.

93.     Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

94.     The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

95.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

96.     The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## FIRST COUNT
### Violation of Sections 1 and 3 of the Sherman Act
### (on behalf of Plaintiff and the Nationwide Class)

97.     Plaintiff repeats the allegations set forth above as if fully set forth herein.

98.     Defendants and unnamed conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

99.     The acts done by each of the Defendants as part of, and in furtherance of, their contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

100.    During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to establish a price floor and artificially fix, raise, stabilize, and control prices for generic Lidocaine/Prilocaine cream, thereby creating anticompetitive effects.

101.    The conspiratorial acts and combinations have caused unreasonable restraints in the market for generic Lidocaine/Prilocaine cream sold in the United States.

102.    As a result of Defendants' unlawful conduct, Plaintiff and other similarly situated indirect purchasers in the Nationwide Class who purchased generic Lidocaine/Prilocaine cream have been harmed by being forced to pay inflated, supracompetitive prices for generic Lidocaine/Prilocaine cream.

103.    In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth herein.

104.    Defendants' conspiracy had the following effects, among others:

        a.      Price competition in the market for generic Lidocaine/Prilocaine cream has been restrained, suppressed, and/or eliminated in the United States;

        b.      Prices for generic Lidocaine/Prilocaine cream provided by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

        c.      Plaintiff and members of the Nationwide Class who purchased generic Lidocaine/Prilocaine cream indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

105.    Plaintiff and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for generic Lidocaine/Prilocaine cream purchased indirectly from Defendants and the co-conspirators than they would have paid and will pay in the absence of the conspiracy.

106.    The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

107.    Plaintiff and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

## SECOND COUNT
### Violation of State Antitrust Statutes
### (on behalf of Plaintiff and the Damages Class)

108.  Plaintiff repeats the allegations set forth above as if fully set forth herein.

109.    During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of generic Lidocaine/Prilocaine cream in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

110.    The contract, combination, or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supracompetitive prices for generic Lidocaine/Prilocaine cream and to allocate customers for generic Lidocaine/Prilocaine cream in the United States.

111.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including: (a) participating in meetings and conversations among themselves in the United States during which they agreed to price generic Lidocaine/Prilocaine cream at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiff and members of the Damages Class with respect to generic Lidocaine/Prilocaine cream provided in the United States; and (b) participating in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

112.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, increase, maintain, or stabilize prices of generic Lidocaine/Prilocaine cream.

113.    Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the following state antitrust statutes.

114.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Alabama Code § 6-6-60, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) price competition for generic Lidocaine/Prilocaine cream was restrained, suppressed, and eliminated throughout Alabama; (2) generic Lidocaine/Prilocaine cream prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine/Prilocaine cream. During the Class Period, Defendants' illegal conduct substantially affected Alabama commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Alabama Code § 6-6-60, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Alabama Code § 6-6-60, *et seq*.

115.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Arizona Revised Statutes, §§ 44-1401, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) price competition for generic Lidocaine/Prilocaine cream was restrained, suppressed, and eliminated throughout Arizona; (2) generic

Lidocaine/Prilocaine cream prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine/Prilocaine cream. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1401, *et seq.*

116.    Defendants have entered into an unlawful agreement in restraint of trade in violation of California Business and Professions Code §§ 16700 *et seq*. During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of California Business and Professions Code Section §16720. Defendants, and each of them, have acted in violation of Section 16720 to fix, raise, stabilize, and maintain prices of generic Lidocaine/Prilocaine cream at supracompetitive levels. The aforesaid violations of Section 16720 consisted, without limitation, of a continuing unlawful trust and concert of action among the Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of generic Lidocaine/Prilocaine. For the purpose of forming and effectuating the unlawful trust, the Defendants and their co-conspirators have done those things which they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth above and creating a price floor, fixing, raising, and stabilizing the price of generic

Lidocaine/Prilocaine cream. The combination and conspiracy alleged herein has had, *inter alia*, the following effects: (1) price competition for generic Lidocaine/Prilocaine cream has been restrained, suppressed, and/or eliminated in the State of California; (2) prices for generic Lidocaine/Prilocaine cream provided by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California and throughout the United States; and (3) those who purchased generic Lidocaine/Prilocaine cream directly or indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property in that they paid more for generic Lidocaine/Prilocaine cream than they otherwise would have paid in the absence of Defendants' unlawful conduct. As a result of Defendants' violation of Section 16720, Plaintiff and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to California Business and Professions Code § 16750(a).

117.    Defendants have entered into an unlawful agreement in restraint of trade in violation of District of Columbia Code Annotated §§ 28-4501, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) generic Lidocaine/Prilocaine cream price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) generic Lidocaine/Prilocaine cream prices were raised, fixed, maintained and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiff and members of the Damages Class, including those who resided in the District of Columbia and/or purchased generic Lidocaine/Prilocaine cream that were shipped by Defendants or their co-conspirators, were deprived of free and open competition, including in the District of Columbia; and (4)

Plaintiff and members of the Damages Class, including those who resided in the District of Columbia and/or purchased generic Lidocaine/Prilocaine cream in the District of Columbia that were shipped by Defendants or their co-conspirators, paid supracompetitive, artificially inflated prices for generic Lidocaine/Prilocaine cream, including in the District of Columbia. During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Ann. §§ 28-4501, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. §§ 28-4501, *et seq.*

118.     Defendants have entered into an unlawful agreement in restraint of trade in violation of Hawaii Revised Statutes Annotated §§ 480-1, *et seq.* Defendants' unlawful conduct had the following effects: (1) generic Lidocaine/Prilocaine cream price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) generic Lidocaine/Prilocaine cream prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine/Prilocaine cream. During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Hawaii

Revised Statutes Annotated §§ 480-4, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Hawaii Revised Statutes Annotated §§ 480-4, *et seq*.

119.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act (740 Illinois Compiled Statutes 10/1, *et seq.*) Defendants' combinations or conspiracies had the following effects: (1) generic Lidocaine/Prilocaine cream price competition was restrained, suppressed, and eliminated throughout Illinois; (2) generic Lidocaine/Prilocaine cream prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine/Prilocaine cream. During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.

120.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code §§ 553.1, *et seq*. Defendants' combinations or conspiracies had the following effects:  (1) generic Lidocaine/Prilocaine cream price competition was restrained, suppressed, and eliminated throughout Iowa; (2) generic Lidocaine/Prilocaine cream prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine/Prilocaine cream. During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. As a direct and proximate result of Defendants' unlawful conduct,

Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§ 553.1, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Iowa Code §§ 553, *et seq.*

121.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Kansas Statutes Annotated, §§ 50-101, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) generic Lidocaine/Prilocaine cream price competition was restrained, suppressed, and eliminated throughout Kansas; (2) generic Lidocaine/Prilocaine cream prices were raised, fixed, maintained and stabilized at artificially high levels throughout Kansas; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine/Prilocaine cream. During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. §§ 50-101, *et seq.*

122.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Maine Revised Statutes (Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*). Defendants' combinations or conspiracies had the following effects: (1) generic Lidocaine/Prilocaine cream price competition was restrained, suppressed, and eliminated throughout Maine; (2) generic

Lidocaine/Prilocaine cream prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maine; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine/Prilocaine cream. During the Class Period, Defendants' illegal conduct substantially affected Maine commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

123.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Michigan Compiled Laws Annotated §§ 445.771, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) generic Lidocaine/Prilocaine cream price competition was restrained, suppressed, and eliminated throughout Michigan; (2) generic Lidocaine/Prilocaine cream prices were raised, fixed, maintained and stabilized at artificially high levels throughout Michigan; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine/Prilocaine cream. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.771, *et seq*. Accordingly, Plaintiff and members

of the Damages Class seek all relief available under Michigan Comp. Laws Ann. §§ 445.771, *et seq.*

124.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Minnesota Annotated Statutes §§ 325D.49, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) generic Lidocaine/Prilocaine cream price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) generic Lidocaine/Prilocaine cream prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine/Prilocaine cream. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.49, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Minnesota Stat. §§ 325D.49, *et seq.*

125.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Mississippi Code Annotated §§ 75-21-1, *et seq*. Defendants' combinations or conspiracies had the following effects:  (1) generic Lidocaine/Prilocaine cream price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) generic Lidocaine/Prilocaine cream prices were raised, fixed, maintained and stabilized at artificially high levels throughout Mississippi; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid

supracompetitive, artificially inflated prices for generic Lidocaine/Prilocaine cream. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. § 75-21-1, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all relief available under Mississippi Code Ann. § 75-21-1, *et seq.*

126.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) generic Lidocaine/Prilocaine cream price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) generic Lidocaine/Prilocaine cream prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine/Prilocaine cream. During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Nebraska Revised Statutes §§ 59-801, *et seq.*

127.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Nevada Revised Statutes Annotated §§ 598A.010, *et seq*. Defendants' combinations

or conspiracies had the following effects: (1) generic Lidocaine/Prilocaine cream price competition was restrained, suppressed, and eliminated throughout Nevada; (2) Lidocaine/Prilocaine cream prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nevada; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine/Prilocaine cream. During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. §§ 598A, *et seq.*

128.    Defendants have entered into an unlawful agreement in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) generic Lidocaine/Prilocaine cream price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) generic Lidocaine/Prilocaine cream prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine/Prilocaine cream. During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further

44

injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under New Hampshire Revised Statutes §§ 356:1, *et seq*.

129.    Defendants have entered into an unlawful agreement in restraint of trade in violation of New Mexico Statutes Annotated §§ 57-1-1, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) generic Lidocaine/Prilocaine cream price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) generic Lidocaine/Prilocaine cream prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine/Prilocaine cream. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under New Mexico Stat. Ann. §§ 57-1-1, *et seq*.

130.    Defendants have entered into an unlawful agreement in restraint of trade in violation of New York General Business Laws §§ 340, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) generic Lidocaine/Prilocaine cream price competition was restrained, suppressed, and eliminated throughout New York; (2) generic Lidocaine/Prilocaine cream prices were raised, fixed, maintained and stabilized at artificially

high levels throughout New York; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine/Prilocaine cream that were higher than they would have been absent the Defendants' illegal acts. During the Class Period, Defendants' illegal conduct substantially affected New York commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of the New York Donnelly Act, §§ 340, *et seq*. The conduct set forth above is a *per se* violation of the Act. Accordingly, Plaintiff and members of the Damages Class seek all relief available under New York Gen. Bus. Law §§ 340, *et seq*.

131.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes §§ 75-1, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) generic Lidocaine/Prilocaine cream price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) generic Lidocaine/Prilocaine cream prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine/Prilocaine cream. During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade

in violation of North Carolina Gen. Stat. §§ 75-1, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under North Carolina Gen. Stat. §§ 75-1, *et. seq*.

132.    Defendants have entered into an unlawful agreement in restraint of trade in violation of North Dakota Century Code §§ 51-08.1-01, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) generic Lidocaine/Prilocaine cream price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) generic Lidocaine/Prilocaine cream prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Dakota; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine/Prilocaine cream. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§ 51-08.1-01, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under North Dakota Cent. Code §§ 51-08.1-01, *et seq*.

133.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) generic Lidocaine/Prilocaine cream price competition was restrained, suppressed, and eliminated throughout Oregon; (2) generic Lidocaine/Prilocaine cream prices were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon; (3) Plaintiff and members of the Damages Class were deprived of free and open

competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine/Prilocaine cream. During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Oregon Revised Statutes §§ 646.705, *et seq*.

134.    Defendants have entered into an unlawful agreement in restraint of trade in violation of South Dakota Codified Laws §§ 37-1-3.1, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) generic Lidocaine/Prilocaine cream price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) generic Lidocaine/Prilocaine cream prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Dakota; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine/Prilocaine cream. During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §§ 37-1, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. §§ 37-1, *et seq*.

135.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Tennessee Code Annotated §§ 47-25-101, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) generic Lidocaine/Prilocaine cream price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) generic Lidocaine/Prilocaine cream prices were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine/Prilocaine cream. During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Tennessee Code Ann. §§ 47-25-101, *et seq*.

136.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Utah Code Annotated §§ 76-10-911, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) generic Lidocaine/Prilocaine cream price competition was restrained, suppressed, and eliminated throughout Utah; (2) generic Lidocaine/Prilocaine cream prices were raised, fixed, maintained and stabilized at artificially high levels throughout Utah; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine/Prilocaine cream. During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce. As a direct and

proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Utah Code Annotated §§ 76-10-911, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Utah Code Annotated §§ 76-10-911, *et seq*.

137.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Vermont Stat. Ann. 9 §§ 2453, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) generic Lidocaine/Prilocaine cream price competition was restrained, suppressed, and eliminated throughout Vermont; (2) generic Lidocaine/Prilocaine cream prices were raised, fixed, maintained and stabilized at artificially high levels throughout Vermont; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine/Prilocaine cream. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Vermont Stat. Ann. 9 §§ 2453, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Vermont Stat. Ann. 9 §§ 2453, *et seq*.

138.    Defendants have entered into an unlawful agreement in restraint of trade in violation of West Virginia Code §§ 47-18-1, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) generic Lidocaine/Prilocaine cream price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) generic

Lidocaine/Prilocaine cream prices were raised, fixed, maintained and stabilized at artificially high levels throughout West Virginia; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine/Prilocaine cream. During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of West Virginia Code §§ 47-18-1, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under West Virginia Code §§ 47-18-1, *et seq*.

139.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes §§ 133.01, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) generic Lidocaine/Prilocaine cream price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) generic Lidocaine/Prilocaine cream prices were raised, fixed, maintained and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine/Prilocaine cream. During the Class Period, Defendants' illegal conduct had a substantial effect on Wisconsin commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of

Wisconsin Stat. §§ 133.01, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Wisconsin Stat. §§ 133.01, *et seq*.

140.    Plaintiff and members of the Damages Class in each of the above states have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement. Plaintiff and members of the Damages Class have paid more for generic Lidocaine/Prilocaine cream than they otherwise would have paid in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

141.    In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of Plaintiff and members of the Damages Class.

142.    Accordingly, Plaintiff and members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

**THIRD COUNT**
**Violation of State Consumer Protection Statutes**
**(on behalf of Plaintiff and the Damages Class)**

143.    Plaintiff repeats the allegations set forth above as if fully set forth herein.

144.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

145.    Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-101, *et. seq*. Defendants knowingly

agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Lidocaine/Prilocaine cream were sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from Plaintiff and members of the Damages Class. The aforementioned conduct on the part of the Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10). Defendants' unlawful conduct had the following effects: (1) generic Lidocaine/Prilocaine cream price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) generic Lidocaine/Prilocaine cream prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine/Prilocaine cream. During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers. As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10) and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

146.    Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq*. During the Class Period, Defendants manufactured, marketed, sold, or distributed generic Lidocaine/Prilocaine cream in California, and committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq.* of the California

Business and Professions Code, by engaging in the acts and practices specified above. This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law. The Defendants' conduct as alleged herein violated Section 17200. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code §17200, *et seq.*, including, but not limited to, the following:   (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of Section 16720, *et seq.* of the California Business and Professions Code, set forth above. Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of Section 16720, *et seq.* of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent; (3) Defendants' acts or practices are unfair to purchasers of  generic Lidocaine/Prilocaine cream in the State of California within the meaning of Section 17200, California Business and Professions Code; and (4) Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code. Plaintiff and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices. The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future. The unlawful and unfair business practices of Defendants, and each of

them, as described above, have caused and continue to cause Plaintiff and members of the Damages Class to pay supracompetitive and artificially-inflated prices for generic Lidocaine/Prilocaine cream. Plaintiff and members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition. The conduct of Defendants as alleged in this Complaint violates Section 17200 of the California Business and Professions Code. As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiff and members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, §§17203 and 17204.

147.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which generic Lidocaine/Prilocaine cream were sold, distributed or obtained in the District of Columbia. The foregoing conduct constitutes "unlawful trade practices," within the meaning of D.C. Code § 28-3904. Plaintiff and members of the Damages Class were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for generic Lidocaine/Prilocaine cream. Defendants had the sole power to set that price and Plaintiff and members of the Damages Class had no power to negotiate a lower price. Moreover, Plaintiff and members of the Damages Class

lacked any meaningful choice in purchasing generic Lidocaine/Prilocaine cream because they were unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiff and members of the Damages Class could avoid the overcharges. Defendants' conduct with regard to sales of generic Lidocaine/Prilocaine cream, including their illegal conspiracy to secretly fix the price of generic Lidocaine/Prilocaine cream at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiff and the public. Defendants took grossly unfair advantage of Plaintiff and members of the Damages Class. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for purchasers so that there was a gross disparity between the price paid and the value received for generic Lidocaine/Prilocaine cream. Defendants' unlawful conduct had the following effects: (1) generic Lidocaine/Prilocaine cream price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) generic Lidocaine/Prilocaine cream prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine/Prilocaine cream. As a direct and proximate result of the Defendants' conduct, Plaintiff and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.*, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

148.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.* Defendants' unlawful conduct had the following effects: (1) generic Lidocaine/Prilocaine cream price competition was restrained, suppressed, and eliminated throughout Florida; (2) generic Lidocaine/Prilocaine cream prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine/Prilocaine cream. During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq.*, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

149.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Hawaii Revised Statutes Annotated §§ 480-1, *et seq.* Defendants' unlawful conduct had the following effects: (1) generic Lidocaine/Prilocaine cream price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) generic Lidocaine/Prilocaine cream prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine/Prilocaine cream. During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce and

consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Hawaii Rev. Stat. § 480, *et seq.*, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

150.    Defendants have engaged in unfair competition or unlawful, unfair, unconscionable, or deceptive acts or practices in violation of the Massachusetts Gen. Laws, Ch 93A, § 1, *et seq*. Defendants were engaged in trade or commerce as defined by G.L. 93A. Defendants, in a market that includes Massachusetts, agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Lidocaine/Prilocaine cream were sold, distributed, or obtained in Massachusetts and took efforts to conceal their agreements from Plaintiff and members of the Damages Class. The aforementioned conduct on the part of the Defendants constituted "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce," in violation of Massachusetts Gen. Laws, Ch 93A, § 2, 11. Defendants' unlawful conduct had the following effects: (1) generic Lidocaine/Prilocaine cream price competition was restrained, suppressed, and eliminated throughout Massachusetts; (2) generic Lidocaine/Prilocaine cream prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Massachusetts; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and the members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine/Prilocaine cream. During the Class Period, Defendants' illegal conduct substantially affected Massachusetts commerce and consumers. As a direct and proximate result of the

unlawful conduct of the Defendants, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Massachusetts Gen. Laws, Ch 93A, §§ 2, 11, that were knowing or willful, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute, including multiple damages.

151.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et. seq.* Plaintiff and members of the Damages Class purchased generic Lidocaine/Prilocaine cream for personal or family purposes. Defendants engaged in the conduct described herein in connection with the sale of generic Lidocaine/Prilocaine cream in trade or commerce in a market that includes Missouri. Defendants agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which generic Lidocaine/Prilocaine cream were sold, distributed, or obtained in Missouri, which conduct constituted unfair practices in that it was unlawful under federal and state law, violated public policy, was unethical, oppressive and unscrupulous, and caused substantial injury to Plaintiff and members of the Damages Class. Defendants concealed, suppressed, and omitted to disclose material facts to Plaintiff and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Lidocaine/Prilocaine cream. The concealed, suppressed, and omitted facts would have been important to Plaintiff and members of the Damages Class as they related to the cost of generic Lidocaine/Prilocaine cream they purchased. Defendants misrepresented the real cause of price increases and/or the absence of price reductions in generic Lidocaine/Prilocaine cream by making public statements that were not in

accord with the facts. Defendants' statements and conduct concerning the price of generic Lidocaine/Prilocaine cream were deceptive as they had the tendency or capacity to mislead Plaintiff and members of the Damages Class to believe that they were purchasing generic Lidocaine/Prilocaine cream  at prices established by a free and fair market. Defendants' unlawful conduct had the following effects: (1) generic Lidocaine/Prilocaine cream  price competition was restrained, suppressed, and eliminated throughout Missouri; (2) generic Lidocaine/Prilocaine cream prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Missouri; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine/Prilocaine cream. The foregoing acts and practices constituted unlawful practices in violation of the Missouri Merchandising Practices Act. As a direct and proximate result of the above-described unlawful practices, Plaintiff and members of the Damages Class suffered ascertainable loss of money or property. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Missouri's Merchandising Practices Act, specifically Mo. Rev. Stat. § 407.020, which prohibits "the act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce…," as further interpreted by the Missouri Code of State Regulations, 15 CSR 60-7.010, *et seq.*, 15 CSR 60-8.010, *et seq.*, and 15 CSR 60-9.010, *et seq.*, and Mo. Rev. Stat. § 407.025, which provides for the relief sought in this count.

152.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana Unfair Trade Practices and Consumer

Protection Act of 1970, Mont. Code, §§ 30-14-103, *et seq*., and §§ 30-14-201, *et. seq.* Defendants' unlawful conduct had the following effects: (1) generic Lidocaine/Prilocaine cream price competition was restrained, suppressed, and eliminated throughout Montana; (2) generic Lidocaine/Prilocaine cream prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine/Prilocaine cream. During the Class Period, Defendants marketed, sold, or distributed generic Lidocaine/Prilocaine cream in Montana, and Defendants' illegal conduct substantially affected Montana commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code, §§ 30-14-103, *et seq*., and §§ 30-14-201, *et. seq.*, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

153.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Lidocaine/Prilocaine cream were sold, distributed or obtained in New Mexico and took efforts to conceal their agreements from Plaintiff and members of the Damages Class. The aforementioned conduct on the part of the Defendants constituted "unconscionable trade practices," in violation of N.M.S.A. Stat. § 57-12-3, in that such conduct, inter alia, resulted in a gross disparity between the value received by Plaintiff and members of the Damages Class and the prices paid by them

for generic Lidocaine/Prilocaine cream as set forth in N.M.S.A., § 57-12-2E. Plaintiff and members of the Damages Class were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for generic Lidocaine/Prilocaine cream. Defendants had the sole power to set that price and Plaintiff and members of the Damages Class had no power to negotiate a lower price. Moreover, Plaintiff and members of the Damages Class lacked any meaningful choice in purchasing generic Lidocaine/Prilocaine cream because they were unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiff and members of the Damages Class could avoid the overcharges. Defendants' conduct with regard to sales of generic Lidocaine/Prilocaine cream, including their illegal conspiracy to secretly fix the price of generic Lidocaine/Prilocaine cream at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiff and the public. Defendants took grossly unfair advantage of Plaintiff and members of the Damages Class. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for generic Lidocaine/Prilocaine cream. Defendants' unlawful conduct had the following effects: (1) generic Lidocaine/Prilocaine cream price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) generic Lidocaine/Prilocaine cream prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic

Lidocaine/Prilocaine cream. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers. As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiff and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq.*, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

154.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.* Defendants agree to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which generic Lidocaine/Prilocaine cream were sold, distributed or obtained in New York and took efforts to conceal their agreements from Plaintiff and members of the Damages Class. Defendants and their co-conspirators made public statements about the prices of generic Lidocaine/Prilocaine cream that either omitted material information that rendered the statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for generic Lidocaine/Prilocaine cream; and Defendants alone possessed material information that was relevant to consumers, but failed to provide the information. Because of Defendants' unlawful trade practices in the State of New York, New York class members who indirectly purchased generic Lidocaine/Prilocaine cream were misled to believe that they were paying a fair price for generic Lidocaine/Prilocaine cream or the price increases for generic Lidocaine/Prilocaine cream were for valid business reasons; and similarly situated consumers were potentially affected by Defendants' conspiracy. Defendants knew that their unlawful trade practices with respect to pricing generic Lidocaine/Prilocaine cream would have an impact on

New York consumers and not just the Defendants' direct customers. Defendants knew that their unlawful trade practices with respect to pricing generic Lidocaine/Prilocaine cream would have a broad impact, causing consumer class members who indirectly purchased generic Lidocaine/Prilocaine cream to be injured by paying more for generic Lidocaine/Prilocaine cream than they would have paid in the absence of Defendants' unlawful trade acts and practices. The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects:  (1) generic Lidocaine/Prilocaine cream price competition was restrained, suppressed, and eliminated throughout New York; (2) generic Lidocaine/Prilocaine cream prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine/Prilocaine cream. During the Class Period, Defendants marketed, sold, or distributed generic Lidocaine/Prilocaine cream in New York, and Defendants' illegal conduct substantially affected New York commerce and consumers. During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed generic Lidocaine/Prilocaine cream in New York. Plaintiff and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349 (h).

155.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*. Defendants

agree to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which generic Lidocaine/Prilocaine cream were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from Plaintiff and members of the Damages Class. Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation and maintenance of Defendants' price-fixing conspiracy. Defendants committed inherently deceptive and self-concealing actions, of which Plaintiff and members of the Damages Class could not possibly have been aware. Defendants and their co-conspirators publicly provided pretextual and false justifications regarding their price increases. Defendants' public statements concerning the price of generic Lidocaine/Prilocaine cream created the illusion of competitive pricing controlled by market forces rather than supracompetitive pricing driven by Defendants' illegal conspiracy. Moreover, Defendants deceptively concealed their unlawful activities by mutually agreeing not to divulge the existence of the conspiracy to outsiders. The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects:  (1) generic Lidocaine/Prilocaine cream price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) generic Lidocaine/Prilocaine cream prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive,

artificially inflated prices for generic Lidocaine/Prilocaine cream. During the Class Period, Defendants marketed, sold, or distributed generic Lidocaine/Prilocaine cream in North Carolina, and Defendants' illegal conduct substantially affected North Carolina commerce and consumers. During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed generic Lidocaine/Prilocaine cream in North Carolina. Plaintiff and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, et seq., and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

156.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act (R.I. Gen. Laws §§ 6-13.1-1, *et seq.*) Members of this Damages Class purchased generic Lidocaine/Prilocaine cream for personal, family, or household purposes. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Rhode Island, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Lidocaine/Prilocaine cream were sold, distributed, or obtained in Rhode Island. Defendants deliberately failed to disclose material facts to Plaintiff and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Lidocaine/Prilocaine cream. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average non-business purchaser, Defendants breached that duty by their silence. Defendants misrepresented to all purchasers

during the Class Period that Defendants' generic Lidocaine/Prilocaine cream prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Lidocaine/Prilocaine cream price   competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) generic Lidocaine/Prilocaine cream  prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine/Prilocaine cream. As a direct and proximate result of the Defendants' violations of law, Plaintiff and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Lidocaine/Prilocaine cream, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Lidocaine/Prilocaine cream at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiff and members of the Damages Class as they related to the cost of generic Lidocaine/Prilocaine cream they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island Gen. Laws. § 6-13.1-1, *et seq.*, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

157.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act (S.C. Code

Ann. §§ 39-5-10, *et seq.*). Defendants' combinations or conspiracies had the following effects: (1) generic Lidocaine/Prilocaine cream price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) generic Lidocaine/Prilocaine cream prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine/Prilocaine during the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. §§ 39-5-10, *et seq.*, and, accordingly, Plaintiff and the members of the Damages Class seek all relief available under that statute.

158.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Lidocaine/Prilocaine cream were sold, distributed, or obtained in Vermont. Defendants deliberately failed to disclose material facts to Plaintiff and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Lidocaine/Prilocaine cream. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that

Defendants' generic Lidocaine/Prilocaine cream prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Lidocaine/Prilocaine cream price competition was restrained, suppressed, and eliminated throughout Vermont; (2) generic Lidocaine/Prilocaine cream prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine/Prilocaine. As a direct and proximate result of the Defendants' violations of law, Plaintiff and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Lidocaine/Prilocaine cream, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Lidocaine/Prilocaine cream at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

### FOURTH COUNT
**Unjust Enrichment**
**(on behalf of Plaintiff and the Damages Class)**

159.    Plaintiff repeats the allegations set forth above as if fully set forth herein.

160.    As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched. Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on generic Lidocaine/Prilocaine cream.

161.    Defendants have benefited from their unlawful acts and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiff and members of the Damages Class for generic Lidocaine/Prilocaine cream manufactured and/or distributed by Defendants during the Class Period.

162.    Plaintiff and members of the Damages Class are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct. Plaintiff and members of the Damages Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiff and members of the Damages Class may make claims on a *pro rata* basis

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment that:

1.    The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

2.    That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed: (a) an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act; (b) a *per se* violation of Section 1 of the Sherman Act; (c) An unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and (d) Acts of unjust enrichment by Defendants as set forth herein.

3.      Plaintiff and members of the Damages Class recover damages, to the maximum extent allowed under such laws, and that a joint and several judgment in favor of Plaintiff and members of the Damages Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

4.      Plaintiff and members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

5.      Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

6.      Plaintiff and members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment;

7.      Plaintiff and members of the Classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

8.      Plaintiff and members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

9.      Plaintiff and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: January 13, 2017                 Respectfully submitted,

By: Katie K Beran
Katie R. Beran
Brent W. Landau
HAUSFELD LLP
325 Chestnut St., Suite 900
Philadelphia, PA 19106
Tel: (215) 985-3270
Fax: (215) 985-3271
Email: kberan@hausfeld.com
Email: blandau@hausfeld.com

Michael P. Lehmann
Bonny E. Sweeney
Christopher L. Lebsock
Stephanie Y. Cho
HAUSFELD LLP
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Tel:  (415) 633-1908
Fax:  (415) 358-4980
Email:  mlehmann@hausfeld.com
Email:  bsweeney@hausfeld.com
Email:  clebsock@hausfeld.com
Email:  scho@hausfeld.com

Michael D. Hausfeld
Jeannine M. Kenney
HAUSFELD LLP
1700 K Street NW, Suite 650
Washington, DC 20006
Tel: (202) 540-7200
Fax: (202) 540-7201
Email:  mhausfeld@hausfeld.com
Email:  jkenney@hausfeld.com

Frank R. Schirripa
Daniel B. Rehns
HACH ROSE SCHIRRIPA & CHEVERIE LLP
185 Madison Ave.
New York, New York 10016
Tel: (212) 213-8311
Email:   FSchirripa@hrsclaw.com
Email:   DRehns@hrsclaw.com

*Counsel for Plaintiff International Union of
Operating Engineers Local 30 Benefits Fund*